**Opinion issued March 29, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-23-00713-CV**
_____

**IN THE INTEREST OF J.C.D.Y. AKA J.Y., J.E.D.Y. AKA J.Y., M.M.D.Y. AKA M.Y., I.E.J. AKA I.J., M.D.K.G. AKA M.Y. AKA M.O.D.Y., and J.T.D.Y. AKA J.Y., CHILDREN**

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-00167J**

**MEMORANDUM OPINION**

C.B.A.K. ("Mother") challenges the trial court's final decree terminating her parental rights to her minor children M.D.K.G. AKA M.Y. AKA M.O.D.Y. ("Mike") and I.E.J. AKA I.J. ("Ivan"). The trial court terminated Mother's parental rights to Mike based on the court's finding that Mother committed the predicate acts

under Texas Family Code Section 161.001(b)(1)(D), (E), (J), and (O), and it terminated Mother's parental rights to Ivan based on the court's finding that Mother committed the predicate acts under Section 161.001(b)(1)(D), (E), and (O). Mother argues there is legally and factually insufficient evidence supporting the trial court's findings that termination of her parental rights was in Mike's and Ivan's best interest.

We affirm the trial court's final decree.

## Background

Mother has six children: Mike, J.T.D.Y. AKA J.Y. ("Julie"), J.C.D.Y. AKA J.Y. ("Jack"), J.E.D.Y. AKA J.Y. ("John"), M.M.D.Y. AKA M.Y. ("Mark"), and Ivan. Mike's father is K.G. ("Father G"), Ivan's father is N.D.J. ("Father J"), and Julie, Jack, John, and Mark's father is M.Y. ("Father Y").

### A. Family's History with the Department

The record reflects that the family has been involved with the Department since at least March 2014.

On March 1, 2014, the Department received a referral alleging child neglect and physical abuse. According to the referral, the household included Mother, who was pregnant, her paramour, and four children between the ages of one and six years old. The family was living in "deplorable conditions." The house was "nasty" and there was a "stench as you walk into the home." It was littered with clothes "and

2

stuff," and did not have "a sink, a bathroom shower or tub." There was an in-ground pool in the backyard, but no fencing.

According to the referral, Mother, who was pregnant with Mark, had been high the day before during a party at the house. Mother's speech was slurred, her eyes were "red blood-shot, and she could not carry a conversation." Father Y, who attended the party, said there was "a lot of marijuana in the home," but the Department did not know if the "marijuana was left out where the children had access to it." The Department's disposition stated, "unable to determine and ruled out."

On March 2, 2014, Mother and Father Y had a "family dispute." Father Y "shot at the car with the mother and children inside," and then "committed suicide with a gun in front of the children" and Mother.

On May 31, 2014, the Department received a referral alleging physical abuse after Mother and Mark tested positive for marijuana at Mark's birth. Mother said she was using marijuana to cope with prior domestic violence and Father Y's suicide. Mother only sought prenatal care with Mark after her seventh month of pregnancy. Following this referral, Mother entered into a family-based safety services plan ("FBSS") with the Department. Among other things, the FBSS required Mother to refrain from illegal drug use, submit to random drug testing, and have Mother's sister

move into the home to serve as a monitor. In October 2014, the Department reported that Mother had been compliant with the FBSS.

On May 14, 2019, the Department received a referral for physical neglect from one of Julie's teachers. According to the referral, Julie's hygiene had been deteriorating since early April 2019, and her clothes had a "very strong urine smell." Julie, who weighed 80 only pounds despite being 5' 8," was "skinny" and she often asked to take food home from school. The teacher knew that Julie helped care for the younger children and she had heard that the utilities in Julie's home were often not working. The Department investigated and found the home in good shape, but no disposition was given because it was an "Alternate Response Case."

On February 26, 2020, the Department received a referral from Father G for physical neglect and physical abuse. According to the referral, the family had been living in a one-bedroom hotel for a week. The hotel room was dirty, clothes were strewn about, and there were no sheets on the bed. Mike, who reportedly slept on the floor, smelled like mildew, his hair was smelly and matted, and he was not wearing any socks. He stated he had gotten into trouble recently for taking a bath. Father G wanted to take Mike and get him cleaned up, but Mike was too afraid to leave his siblings and he was scared that Mother would find out he had been talking to Father G.

According to Father G, Mike was skinny, he appeared malnourished, and his leg bones protruded. Mike told Father G that he was fed three meals per day on some days, but he went to bed without food on other days. Mike, who was twelve years old, stated that he had not been in school in a month, and he was left to care for his five younger siblings, including two-year-old Ivan, when Mother went out. Mike told Father G that Mother and her boyfriend spent all their money on marijuana, and Mike had seen Mother smoke marijuana. Father G believed that Mike was depressed.

Father G made the referral after Mike found him on Instagram. Father G told the Department this was the first time he had seen Mike in seven years because Mother had been hiding Mike from him. Father G expressed concern that Mother would disappear with the family again. The record reflects that the Department was unable to investigate because it could not locate the family.[1]

## B.  Present Case

On February 2, 2022, the Texas Department of Family and Protective Services filed an Original Petition for Protection of a Child for Conservatorship, and for

---

[1]  On July 12, 2022, six months after the children were taken into the Department's care, Julie reported that she had been sexually abused by two maternal uncles when she was six years old and eleven years old. Julie stated she told Mother about the abuse, and Mike confirmed he knew about it. According to Julie, a maternal aunt may also have seen the abuse. On July 25, 2022, Julie made a detailed outcry of abuse. It is not necessary to discuss the details of the abuse for purposes of this opinion.

Termination in Suit Affecting the Parent-Child Relationship seeking to terminate Mother's parental rights to Mike, Julie, Jack, John, Mark, and Ivan.[2] Brandi Whitely, a Department investigator, prepared the affidavit attached to the Department's petition.

On January 29, 2022, the Department received a referral from law enforcement for physical neglect and physical abuse of Mother's six children. According to Whiteley's affidavit, the police became involved after a concerned citizen reported seeing Mike and Jack walking down the road nearly two miles from Mother's home at 10:45 p.m. The officers found Jack near the home, and they found Mike at a Sonic. The police, who took the boys home, reported that Mother was not at home when they arrived that night, and that Mike was his siblings' primary caretaker when Mother was away. The officers tried to contact Mother, but the calls went straight to voicemail.

The police reported that Mother's home was "unsuitable," and it had "an odor of urine" emanating from within it. According to the referral, the officers saw four rats run through the home, rat holes in the walls, piles of black trash bags in the kitchen and living room, and roaches crawling out of the bags. It appeared to the

---

[2] The Department also sought to establish the children's parentage. After establishing Father J was Ivan's father and Father G was Mike's father, the Department filed an amended petition seeking to terminate Father J's parental rights to Ivan and Father G's parental rights to Mike.

officers that "the children [had not] showered in a few days" and two of the children in the home hid from the police.

The police reported that Ivan, who was three years old, had "excessive marks and scratches all over his body," and it appeared to be "more excessive than just getting bumps and bruises from running around." Ivan had a "fresh" scratch on his back and another on his toe that was bleeding. He also had other marks that "looked old and were scars."

The case was tried to the court over four days: May 10, 2023, May 15, 2023, June 5, 2023, and July 24, 2023. Whitely was the Department's first witness.

## C.    Trial Testimony

Department investigator Brandi Whitely, Department caseworker Victoria Martinez, Mother, Jane Piaskowski with Child Advocates, Department caseworker Shanequa Davis, and substance abuse counselor Lindsey Cason testified for the Department. Margaret Florence and Mother testified on Mother's behalf.

### 1.    Brandy Whitely, Department Investigator

Department Investigator Whitely testified that the police referred the case to the Department after Mike and Jack were caught stealing food from a store and because the children had been "left alone."

Whitely went to the home the next day, on a Sunday, to investigate the referral. According to Whitely, there were six children in the home but no adults.

7

Mike, who answered the door, told Whitely that Mother was at work, and he allowed Whitely to come inside the home to make sure the children were safe. According to Whitely, all the children "had a strong, musty, urine and filth stench that could be smelled when the door opened." The children, who were wearing foul, soiled clothing, had trash or debris stuck in their "severely matted" hair, and it appeared to Whitely that none of them had bathed "for quite some time."

Whitely stated the conditions she observed inside the home were "not livable for the children." The carpets and walls were very dirty, the living room furniture was "soiled with no cushions on them," there were "bags of trash throughout the home," there were no televisions, and "loose wiring was seen hanging out the walls throughout the home." Whitely saw "several rats and roaches in the home, mainly in the kitchen and dining area," and there was a "huge pile of garbage" in the dining area that "had numerous rodents being seen hiding within it."

Whitely testified there was no food in the house. The kitchen did not have a refrigerator or a working stove or microwave, and the kitchen cabinets were bare. According to Whitely, there were no cups, plates, utensils, pots, or pans in the kitchen. Whitely found a deep freezer in the laundry room, but it was empty. The laundry room was filled with soiled clothes on the floor.

The children's bathroom was completely unusable. According to Whitely, the toilet was backed up and there was feces and urine in the toilet and bathroom sink,

which appeared to have been there for a long time. The bathroom sink countertop was broken and the tile on the floor was soiled as well. There was no toilet paper or toiletries in the bathroom, the bathtub was dirty, and there was nowhere in the home for the children to brush their teeth. According to Whitely, the toilets in the home would not flush and the children could not take a bath because there was no running water in the home. The kitchen faucet only emitted a "slow drip."

Although it was a three-bedroom home, "only the master bedroom had a bed that contained a soiled mattress topper" and that belonged to Mother. The foam mattress was soiled with "different substances," including urine. The master bedroom had several trash bags filled with soiled clothes all over the floor. Whitely did not see any beds in the home for the children or anything the children could have used as beds.

Whitely did not believe that the home was a safe environment for the children. She said it was "unlivable" and "horrible," and not acceptable for any child to live in. After inspecting the home, Whitely went to her car to wait for Mother to return. At some point, Whitely tried to return to the home, but when she knocked on the door, the children turned out the lights and refused to answer the door. Whitely called the police for assistance.

Mike answered the door when Whitely and a deputy constable knocked on the door around 10:30 p.m. According to Whitely, several hours had passed since she arrived at the house, and Mother was still not home.

Mike told Whitely that Mother had left the house on Friday morning. He told her he made noodles for the children that day and explained that the house looked the way it did because Mother had taken in some unruly cousins who broke the children's beds. According to Whitely, Mike had a "foul odor on his body," and his hair was "extremely matted." He told Whitely that he had been suffering from a toothache for two weeks and the children had not been in school for a "few months."

Whitely tried to talk to Julie, but Julie "did not want to say what was going on at her home." According to Whitely, Julie appeared to have been coached on what to say to the Department. Julie first insisted that Mother was at work, but she later claimed that Mother had gone out to eat. Whitely also tried to talk with Jack, John, Mark, and Ivan, but they would not answer Whitely's questions. Ivan was dirty and wearing a soiled diaper.

Whitely tried unsuccessfully to contact Mother several times while she was at the home.[3] According to Whitely, there was one cell phone in the home, and although the cell phone did not have any service, the children could use the neighbors' WiFi to FaceTime with Mother when she was away. The children,

---

[3]     Whitley unsuccessfully attempted to contact Father J.

however, did not know how to reach Mother that day because Mother frequently called from random numbers. Whitely called some of the random numbers and she was able to reach one of the children's maternal uncles ("Uncle K"). Uncle K and three other family members arrived at the home twenty minutes later. Whitely testified that Uncle K was unaware the children were living in such conditions and he began "crying with the children."

Mother called Uncle K an hour and a half after he arrived at the house. After Uncle K gave his phone to Whitely, Whitely explained to Mother her concerns with the home and the circumstances in which she found the children. Mother told Whitely that she could not come home then because she was styling someone's hair. According to Whitely, Mother seemed unconcerned that law enforcement and the Department were at her home, until Whitely told Mother that the children would be removed due to the environment and because no caregiver was present. According to Whitely, it took her four hours to contact Mother.

Mother, who arrived home twenty-five minutes after speaking to Whitely, was dropped off at the home by an unknown man driving a Dodge Challenger. According to Whitely, Mother's Porsche and Lincoln Navigator were parked in the driveway. Whitely testified that Mother was well-dressed, "well-kept," her hair was done, her clothes were clean, and she was odor free.

Whitely testified that Mother was very aggressive, and she did not appear to be concerned with the condition of the home. According to Whitely, Mother claimed that someone watched the children when she was out and that they had food in the home. She also claimed the whole incident was a lie and she accused the Department of "just want[ing] to take her children." According to Whitely, Mother "downplayed the home conditions and said they were remodeling the home." Whitely testified that remodeling would not account for the rat and roach infestation, the lack of food, or the condition of the sinks and toilet.

Mother was arrested at the scene for child endangerment and abandonment, and the children were taken into the Department's care. When Whitely asked Mother for names for potential relative placements, Mother suggested Uncle K. Although Uncle K wanted to care for the children, he was not an appropriate placement because he did not have identification and he was living in a third-party's home. Whitely testified that, after Julie was in the Department's care, Julie accused Uncle K of sexual abuse. Although the Department first approved for the children to be placed with their maternal grandmother, the Department found the possible placement inappropriate after it learned the maternal grandmother and a person living in her home had a case pending with the Department. Whitely later learned that while they were in the Department's care, the children made allegations of physical abuse against their maternal grandmother.

Whitely testified that the children were removed from Mother's care because the home was unlivable, Mother had left the children alone overnight, there was no food in the home, it took four hours for Mother to come home and she did so only after Whitely told her that she was preparing to remove the children, and the children had not been in school for months. According to Whitely, Mother often left the children home alone and, in this instance, the children had been left alone at home for a day or two before they were removed. Whitely testified that Mike was fourteen, and while she agreed that the children could be left home alone with a fifteen or sixteen-year-old, they could not be left with a teenager overnight. Whitely testified there was no food in the home, the children were hungry, and they told her they had not eaten since the previous day. Whitely did not believe that the children's weight was appropriate for their ages, and she fed the children before she removed them.

After they were removed from Mother's home, the children were cleaned up at Kinder Shelter. While they were getting cleaned, and afterward, Whitely saw old scars, marks, and bruises on the children.

On January 31, 2022, Department Supervisor Teresa Cruz spoke with Mike and Julie. Mike and Julie told Cruz that Mother had left the home on Friday morning and had not returned until Sunday night after Whitely and police arrived at the home. They told her that Mother left them alone at home all the time and she had not been home much in the past six months. According to Mike and Julie, Mother would

13

leave for a few days, return for a few days, and then leave again.  Mike and Julie told Sanchez it was difficult to contact Mother at times and they did not know which phone number to call because Mother's phone was broken.  Mike did not know where Mother worked and neither he nor Julie knew whether Mother worked days or nights.  Mike told Sanchez that Mother went to cosmetology school in the morning.

Mike and Julie told Sanchez that Ivan's father, Father J, was not around much and "it's a good thing." Mike said that Father J abused Mother and he had seen Father J hit Mother.  Mike and Julie stated that they did not talk to Father Y's family because they are all "crack heads."

Mike and Julie said the house did not always look so bad.  Mike said that they always had running water and Mother's friend had looked at the toilet and sink the previous day.  Mike and Julie stated that the beds had been removed from the home because several months earlier, their cousins had broken the beds.  Mike said that some of his brothers had cut up the mattresses.

Mike and Julie stated they were responsible for cleaning the home, taking care of the younger children, and feeding everyone.  Ivan would stop crying only if Julie picked him up.  Mike and Julie said that Mother would order food for the children, but it would not last because the children would eat it too quickly.  Mike and Julie

stated that if they had done a better job cleaning, they would not have been removed from Mother.

Whitely stated that according to Mother, Mike, and Julie, the children were homeschooled. Although there were five school-aged children in the home, the home had only one laptop, and it required the use of the neighbor's WiFi. Asked how six children could be homeschooled with only one computer, Mike and Julie stated that Ivan had broken a laptop and a tablet.

Mike and Julie said they rarely went outside the home and that Mother did not take them out. Mike had told Mother two weeks earlier that his tooth had been hurting, but she had done nothing. Whitely testified that the children did not want to be in that home.

Whitely testified that after she completed her investigation, Mike and Julie made outcries of sexual and physical abuse. Julie stated that she had been sexually abused by two of her maternal uncles and Mike alleged that Mother had physically abused him. Mike said he "got the worst" of the abuse when the children did anything to upset Mother, and that Mother kicked him in his stomach because she believed he had stolen money from her. Mother also hit Mike in the head with a belt buckle. According to Mike, one of Mother's male friends urged Mother to go easier on Mike. Julie agreed that Mother "beat on" Mike worse than the other children.

## 2. Victoria Martinez

The children's conservatorship caseworker Victoria Martinez testified that Mike is fifteen years old, Julie is fourteen years old, Jack is twelve years old, John is eleven years old, Mark is eight years old, and Ivan is four years old. Father Y, who is deceased, is father to Julie, Jack, John, and Mark. All four children were placed with their paternal grandmother S.M. ("Grandmother"). Ivan, whose father is Father J, was also placed with Grandmother. And Mike was placed with his father, Father G.

On May 15, 2023, Julie, Jack, John, and Mark were removed from Grandmother's home and placed in an emergency shelter. Martinez testified that although the Department was searching for a more desirable placement, the children had attended school for two weeks before summer break and their basic needs were being met in the shelter. Ivan was removed from Grandmother's home the same day as his siblings and he was placed in a special needs foster home.

Martinez testified that Mother's sister J.K. ("Aunt K"), was being considered for possible placement. According to Martinez, Aunt K had taken two drug tests since May 15, 2023. For the first test, Aunt K refused to provide a hair sample and her urine test was negative. At the time of Martinez's testimony, the Department had not yet received the results of Aunt K's second drug test.

Martinez testified that after coming into the Department's care, the children appeared to be happier, they ate more, attended school, their grades improved, their dental and medical needs improved, and they just "enjoy[ed] being children."

Martinez testified that Mike, who was diagnosed with ADHD after he was removed from Mother's care, is in the tenth grade, and has participated in football, basketball, tennis, and baseball. When Mike came into care, he needed intensive dental work, he was suffering from a toothache, and he was behind on his immunizations.

Mike was placed with Father G in August 2022. According to Martinez, Mike is bonded with Father G, Father G is meeting all of Mike's needs, and the Department does not have any concerns about Father G or Mike's placement with him. Martinez testified that, after the Department determined Father G was Mike's biological father, Father G had "done everything that he needs to do to make sure" Mike is safe.[4]

Martinez testified that, on February 25, 2023, Mike visited with Mother in a Wal-Mart parking lot without Father G's permission. This concerned the Department because Mike had experienced extensive abuse and neglect when he was with Mother, and if the Department were to approve any visits between Mike and Mother, such visits would have to be monitored. The Department also was

_____

[4]  Mike's birth certificate identified Father J as his father.

17

concerned because after Mike visited with Mother, he became "more defiant and skipping classes to be with his girlfriend, or not listening to his father," and his grades suffered. Martinez testified that Mother had been giving Mike junk food and she was paying Mike to act out in Father G's home. The Department was concerned that Mother's relationship with Mike could undermine Father G's parenting decisions. When asked if Mike wanted to maintain a relationship with Mother, Martinez testified that Mike told her "he was just going to wait until he was out of [the Department's care] in order to have that contact with his mother because he did not want to get in trouble anymore and get his phone taken away."

Martinez testified that Julie, who is fourteen years old, is a ninth grader and she has performed adequately in school. Julie was diagnosed with anxiety and oppositional defiant disorder. Julie has not visited with Mother.

Jack is twelve years old and in the seventh grade. Martinez testified that after he came into care, Jack was diagnosed with ADHD, major depressive disorder, generalized anxiety disorder, and "mixed disturbance of emotions and conduct." Jack, who is taking medication, has been seeing his therapist, Dr. Lacy, since January 2023, and he is bonded with her. Martinez does not believe that Jack has been in communication with Mother.

John is eleven years old and in the fifth grade. Martinez testified that John was diagnosed with ADHD specified trauma and "stress-related disorder due to

18

multiple transitions" after he came into care. Like Jack, John was also taking medication and seeing Dr. Lacy for therapy.

Mark is eight years old. He is in the second grade and doing fine in school.

Ivan is four years old. According to the Department's April 2023 permanency report, Ivan is "sweet natured and very quiet," and although he is mostly non-verbal, he "comes alive when there is music and opportunities to dance." He was diagnosed with autism on October 6, 2022. Martinez testified that Ivan had been in daycare after he came into the Department's care, but he recently started attending Pre-K. Although he is mostly nonverbal, Ivan had started saying "a few words" and singing songs.

According to the April 2023 permanency report, Ivan "display[ed] clear signs of a child of neglect (disconnected, continually awaiting instruction, needing continual guidance and instruction in play, had to be taught to close his eyes for naps and prayer before meals, etc.)." He was diagnosed with "phase of life problem" and neglect on March 12, 2022, and the report states that "being in a stable and supportive environment is critical for [Ivan's] development." The report reflects that Ivan had "significant cognitive delays," he needed "a comprehensive language-based program in order to make progress with his severe delays," and he received speech and occupational therapy while in the Department's care. Martinez testified

that anyone adopting Ivan would be eligible for adoption subsidies to help provide for Ivan's care. Ivan was also diagnosed with encephalopathy.

As for Ivan's dental health, the report states that Ivan had "fairly extensive [dental] work done prior due to neglect in the home of origin," and his first foster parent noticed that he "would take his food and stuff all the way to his back teeth to chew in the back because the front teeth appeared to be in such pain." The dental care he received while in foster care appears to have resolved his pain.

According to Martinez, Ivan was placed at a specialized foster home after he was removed from Grandmother's home and Ivan's needs are being met in his new placement. Ivan was wearing a diaper when he came into the Department's care, and his potty-training is progressing well in his foster placement.

Martinez testified the children made outcries of physical and sexual abuse after they came into the Department's care. According to Martinez, Jack and Mark told her that Mother "used to whip them constantly with an extension cord," and when she grew tired of hitting them, Mother made them "stand in the corner for hours." Ivan was the only child that did not get whipped. According to the boys, their maternal grandmother would also discipline them by making them stand in the corner for hours. Martinez testified that she saw marks and bruises on all the children. Julie reported that Mother's brothers sexually abused her when she was nine or ten years old, and Mother knew about the abuse.

The Department asked the court to terminate Mother's rights to Julie, Jack, John, Mark, and Ivan and to appoint the Department as the children's permanent managing conservator. When asked why she believed it was in the best interest of the children for Mother's parental rights as to Julie, Jack, John, Mark, and Ivan to be terminated, Martinez testified:

> It's in the best interest of the children just due to the lack of—that [Mother] has not alleviated any of the Department's concerns. [Mother] continues to deny any neglect and abuse took place, even though the children are covered in scars. The children have discussed the physical abuse [by Mother.]
>
> . . .
>
> The children have expressed abuse and neglect that took place in [Mother's] home. They expressed that they were starved or didn't receive any meals, some days that they would fight over the food that was left. They would have to steal for food. The children deserve permanency. They deserve a loving home. They deserve an education, deserve friends, to go out. . . .
>
> They deserve to act as children, to not have to supervise each other's siblings, and just a stable home that's willing to care for them long-term, willing to work with them and their special needs, to keep up with their medical and dental appointments. And [Mother] did not address those needs while they were in her care. [Mother] has gone against [the Department] to visit with [Mike] unsupervised. So the [Department] sees that it's in the best interest that [Mother's] rights are terminated due to all those factors.

Martinez testified that, unlike his siblings, the Department's goal for Mike was family reunification with Father G. The Department asked the trial court to appoint

21

Father G as Mike's primary managing conservator and Mother as Mike's possessory conservator.[5]

### (1) Mother's Family Service Plan

Martinez testified that the Department created a family service plan ("FSP") for Mother. Mother's FSP was filed with the court on April 22, 2022, and made an order of the court. In the FSP, the Department identified several concerns it had with respect to Mother and the children, including the fact that none of the school-aged children had been in school for two years, which required an assessment of their educational needs.

According to the FSP, Mike was beginning to show emotional and behavioral issues. He had been removed from his initial foster home due to possible theft, he had difficulties with peer relationships, and his relationship with Mother was questionable because he had not asked to visit with Mother. The Department was also concerned about Julie's emotional and behavioral health because she often looked to Mike for verbal and non-verbal prompts before responding to questions and she was guarded around her foster family.

---

[5] Martinez did not specifically testify that the Department wanted the court to appoint Father G as Mike's primary managing conservator and Mother as Mike's possessory conservator. This was argued in closing. Martinez testified that the Department's goal for Mike was family reunification with Father G, and she stated on cross-examination that the Department was not requesting that Mother's rights be terminated.

22

Jack's, John's, and Mark's emotional and behavioral health were also of concern. According to the FSP, Jack was diagnosed with neglect, physical abuse, and adjustment disorder after he came into the Department's care, and he was attending mental health counseling. John, who had been diagnosed with physical abuse and adjustment disorder, was attending mental health counseling. Mark had been diagnosed with neglect, physical abuse, and adjustment disorder and he was also attending mental health counseling.

The Department was also concerned about Ivan, who was delayed in his physical and cognitive development. When he came into the Department's care, Ivan was three years old and non-verbal. The FSP recommended that Ivan receive speech, occupational, and play therapy. The FSP also states that Ivan's potty-training and speech delays were due to "trauma." Ivan was doing well with his foster family.

The FSP noted that Mother had not been providing for the children's basic needs because the children did not have adequate food, water, sleeping arrangements, or supervision when they were in Mother's care. According to the FSP, Mother was not present to supervise the children, she had an inadequate support system, and she had shown a lack of parenting knowledge by keeping her children out of school and leaving a fourteen-year-old to supervise five younger children.

23

The goal of the FSP was for Mother to supervise the children, provide appropriate discipline when needed, and provide them with a safe environment free from abuse or neglect. The FSP states that Mother's progress under the FSP would be measured by three criteria, including whether: (1) Mother completed the required tasks/services; 2) achieved the FSP's goals; and 3) provided for the children's ongoing safety and wellbeing.

### (2) Requirements of Mother's FSP

Martinez testified that Mother's FSP required Mother to (1) maintain stable housing for at least six months, (2) provide proof of all income every month, (3) sign a release of information, (4) participate in parenting classes, (5) participate in a psychological assessment and follow all recommendations, (6) participate in individual counseling, (7) maintain a positive support system, (8) participate in random drug testing, and (9) participate in a substance abuse assessment. Martinez testified that although Mother had completed most of her services, she had not satisfied the housing and income requirements in the FSP.

Mother's FSP required her to secure stable housing for a minimum of six months consecutively and throughout the duration of the case. According to an April 2023 permanency report prepared by the Department, Mother told the Department in June 2022 that she was moving out of her old home on July 1, 2022, but that she did not yet have a new address. In July 2022, Mother told the Department that she

was living with a friend, but she did not provide the caseworker with the address. While Mother told the Department in October 2022 that she was "closer to the down payment for her home and will be sending lease and proof of utilities," she did not send a lease or provide an address until February 2023, when Mother provided the Department with "a copy of her lease and her address." According to the report, in March 2023, Mother told the Department she was living in Crockett, Texas and although she provided them with an address, Mother did not provide the Department with an updated lease.

Martinez testified that Mother provided her with a month-to-month lease while the case was pending, and, on May 5, 2023, Mother provided Martinez with a two-year residential lease that commenced on February 1, 2023. Martinez went to the address reflected on the two-year lease that same day, but Mother did not allow Martinez to come inside. According to Martinez, Mother told her she did not feel "comfortable" letting Martinez in because the new home was not up to "the standards that she wished for everyone to see." Mother told Martinez she "wanted [the house] in the best condition for [the Department] and her children to be returned home." Martinez testified that she saw a man and his son at the home, even though Mother claimed she lived alone.

On May 19, 2023, Martinez and Jane Piaskowski from Child Advocates visited Mother's new home. Martinez testified that the cleanliness of Mother's home

was a concern when the children came into care, and although Mother's new home was cluttered, it was much better than the old home. According to Martinez, the closet in Mother's home was cluttered, there were clothes all over the floor and in the garage, and there were "two large trash bags full of trash, open, with like little gnats flying around them." Mother told Martinez she was waiting for the trash pick-up day, but Martinez felt the amount of trash was excessive. Martinez admitted that it was common for closets to be cluttered and that clutter in a closet did not pose a substantial danger or harm to the children.

According to Martinez, one bedroom had a queen-size bed frame but no mattress, the second bedroom had a twin bunkbed with one mattress, and the master bedroom had a queen bed frame with a mattress on the floor. She saw nothing in the home that posed a potential threat to the children if they were returned to Mother. Martinez also saw men's cologne and a man's prescription bottle in Mother's home despite Mother's claim that she lived alone.

While a photograph Mother took depicted a salon inside the home, Martinez testified that she saw only a barber chair and an unattached hair dryer in the garage. Martinez testified that the photographs Mother provided of the home did not accurately depict what the home looked like when Martinez walked through it, and she was concerned Mother's photographs could be "misleading." Martinez testified

that she took photographs when she visited Mother's new home, but Martinez did not provide them to the Department's attorney.

With respect to the FSP's requirement that Mother provide the Department with proof of all sources of income on a monthly basis, the Department's April 2023 permanency report stated that Mother told the Department in April 2022 that she was a cosmetologist, and she did hair on the side. Mother also claimed she did "stocks, real estate and [that she was] in law school." On May 2, 2022, the Department asked Mother to provide check stubs reflecting her income, and Mother reiterated that "her primary method of earning money [was] through her cosmetology practice." In June 2022, the Department asked Mother to provide "a receipt book to get an estimate of the mother's income for the month, but she stated that she [wa]s working on it." In July 2022, Mother told the Department that she had finished cosmetology school and opened her own hair salon, but she did not provide any proof of her income from June 2022 to September 2022. In October 2022, Mother told the Department "she ha[d] salon income and could submit paperwork for it, but Mother did not provide the caseworker with "pay stubs or proof of income" in October 2022, November 2022, or December 2022. In January 2023, Mother gave the caseworker paystubs from Red Lobster. According to the report, Mother did not provide the caseworker with any recent paystubs or proof of income in March 2023.

Martinez testified that on May 5, 2023, Mother told the Department that she owns a Porsche. She also provided Martinez with Cash App screen shots from February 2023, March 2023, and April 2023, and a statement of income Mother said was prepared by her bookkeeper and accountant. Martinez testified that the Cash App screen shots reflected a balance of $400 in February, $1,000 in March, and about $3,000 in April. Although Mother told Martinez that she was a self-employed hairstylist, Martinez testified she could not verify that the sums reflected on the Cash App screen shots represented money Mother earned through her hair styling job. Mother also did not provide Martinez with information reflecting her 2022 income. According to Martinez, the records Mother provided failed to demonstrate Mother had stable income for six months because the records only went back to February 2023.

Mother's FSP also required her to complete individual counseling. Martinez testified that although Mother had completed individual counseling, Martinez had no reason to believe that Mother knew how to change her behavior because,

> [Mother] fails to address that she physically abused the children, that the children were left in an unlivable home. So if the children were to be returned to her, she doesn't know how to change that behavior. It's always going to remain the same because she never properly addressed it in therapy. She doesn't believe what happened was wrong or that she left the children like that.

Martinez also testified that as it concerns the FSP's drug testing requirements, Mother submitted to drug testing through the pendency of the case, and she

28

completed a substance abuse assessment. Martinez testified that while Mother's urine test in April 2023 tested negative,[6] Mother's most recent hair follicle test and urine test, taken after May 15, 2023, both tested positive. According to Martinez, Mother's most recent positive drug test results were concerning to the Department because Mother tested positive after she was successfully discharged from substance abuse treatment on May 9, 2023. The Department was also concerned because Mother's drug usage was an issue when the children came into care, and Mother "continues to deny usage of drugs but continues to test positive in her urine and hair." The record reflects that, between April 6, 2022, and February 1, 2023, Mother failed or refused to submit to thirteen drug tests, all of which the trial court presumed were positive. Although the urine sample Mother provided on February 1, 2023 tested negative, Mother refused to submit a hair sample on the same day, which under the FSP is presumed as a positive test result. Between May 11, 2022, and June 20, 2023, Mother submitted nine urine and hair samples that tested positive for marijuana or marijuana metabolites. Although the urine sample Mother submitted on May 16, 2023 tested negative, the test was invalid because the sample Mother submitted was diluted.

Martinez testified that Mother was charged with abandonment when the children were removed from her care, but the charge was dismissed due to

---

[6] Mother was not required to provide a hair follicle sample.

insufficient evidence. An order prohibiting Mother from having any contact with the children was issued due to Mother's criminal charge, but Martinez did not recall if the order had been issued by the trial court. The order was lifted when the abandonment charge was dismissed. Martinez testified the Department did not schedule any visits between Mother and the children after the no-contact order was lifted because the "therapist did not recommend it." When asked about Mother's claim that even though she attempted to provide support for the children, the Department told her she could not do so, Martinez testified that Mother had never attempted to provide support for the children. Martinez was not aware of any support system Mother had created, which was also required by her FSP.

When asked why the Department's concerns had not been alleviated by Mother's substantial completion of her FSP, Martinez testified:

> Because during therapy, [Mother] continues to deny the children were ever neglected or abused by her. They were never starved. She never left them home alone for week– for days at a time. She never admitted any of that.

According to Martinez, the goal of the FSP was for Mother to complete the services, show "changed behavior," and alleviate the Department's concerns. Despite her work on her FSP, Mother never alleviated the Department's concerns that led to the children's removal from her care.

### 3. Jane Piaskowski, Child Advocates

Jane Piaskowski with Child Advocates is the guardian ad litem for the five youngest children: Julie, Jack, John, Mark, and Ivan. Piaskowski testified that she attended all hearings in the case, met with Mother, and visited with the children several times. According to Piaskowski, the children improved after being removed from Mother's home.

Piaskowski testified that the children's dental health was bad when they came into the Department's care. Their dental records "showed that the children needed a very intensive level of dental care in order to get them to a place where they were pain free and able to develop normally." The four school-aged children—Julie, Jack, John, and Mark—struggled when they were first enrolled in school, but they made friends and seemed happy to be back in a formal educational environment. They had a big adjustment to the work and reading required. The children mentioned both sexual and physical abuse. Piaskowski testified that some of the children told her it was nice to have their own bed and not be hungry. The children also expressed to her that they were bonded to one another and wanted to stay together.

After Julie, Jack, John, and Mark were removed from Grandmother's home in May 2023, they were placed in an emergency shelter. Piaskowski testified that she had visited with the children since their most recent placement, and she agreed with Martinez that the children's basic needs were being met. The children had been in

the emergency placement for about a month and Piaskowski knew of no potential non-relative placements that could take all the children and keep them together. Piaskowski testified that Aunt K wanted to take Julie, Jack, John, Mark, and Ivan, and she was a possible placement.

Piaskowski testified that the children blamed themselves for the problems at home and the older children took "personal responsibility" for coming into care. The older children had talked about taking care of the home and the younger kids, and Julie believed that she could have done a better job. The children told Piaskowski that sometimes there was food in the home, and sometimes the children would fight over food. Piaskowski testified that some of the children accused their siblings of eating too much, and the younger children blamed themselves for eating too much.

When asked if Child Advocates was concerned that the children blamed themselves for the circumstances that led to their removal from Mother's home, Piaskowski testified:

> It's something where they're—we're trying to help them just be kids. They've been through a lot even just coming into care. And so it's something that we try to emphasize with them in terms of their responsibilities as a kid are really relevant to their personal hygiene and behavior and education, and not to take sort of a lot of the problems that the adults or other people in their lives onto their shoulders, but they seem to be—they bring up a lot about how they can change and they can go back with their mom and that their mom needs them. And it seems like they don't have an understanding that a lot of that was not their responsibility to begin with.

Piaskowski testified that even though the children expressed a desire to communicate with Mother or return to her care, this seemed to be related to the children "taking accountability for their personal situation being in foster care." According to Piaskowski, the children appeared to believe that "their family life before they came into care was normal, and they would like to return to all being together with their siblings, and that there wasn't anything in their mind that was different than usual from their lived experience."

Piaskowski testified that the children told her they love Mother, they want to be reunited with Mother, and they feel that Mother needs them. When asked if the children "feel that their mom loves them," Piaskowski testified that she assumed the children felt that way. According to Piaskowski, it was concerning that the children wanted to return to Mother because the children believed that Mother needed them and not because they needed Mother.

With respect to Ivan, Piaskowski testified that Ivan was developmentally delayed when he came into the Department's care but had made progress and was "doing very well" in his current placement. According to Piaskowski, Ivan "ha[d] started to express a little bit more verbally and has been a lot more responsive especially to children his own age in terms of socialization." Piaskowski testified there are other children in Ivan's current home that "he connects with, and when I visited him he seemed to be very happy and doing very well and has continued to

33

progress with his speech, and his potty training is staying on track." Ivan, who was three years old when he came into the Department's care, started attending daycare while living in his most recent placement. Piaskowski testified that the other four children had also adjusted well to their current placement, and she believes that the children's current placements are meeting their needs.

Addressing Mother's FSP, Piaskowski testified that during the pendency of the case, she remained concerned about Mother's desire to complete her FSP because she had not submitted to drug testing regularly or provided proof of employment or stable housing. Piaskowski testified Mother had only partially completed her FSP because although she had completed individual therapy, substance abuse therapy, parenting classes, and submitted to a psychological assessment, Mother had not provided proof of stable housing for six months, provided proof of income, or satisfied the drug testing requirement.

When asked about the FSP's requirement that Mother provide the Department with evidence of all sources of income for herself and her children on a monthly basis, Piaskowski testified that Mother had provided a business lease, but when Piaskowski went to the address listed on the lease on March 28, 2023, the "area was vacant." According to the building's management, Mother had an "established lease there for her salon from. . . July to October of 2022," but Mother had abandoned the property and she owed two months of unpaid rent.

34

When asked if she had seen evidence that Mother was running a hair salon in her home, Piaskowski testified that she had not seen such evidence because the stylist chair in Mother's home was in the garage and the Cash App records Mother provided did not show she had been earning money as a hair stylist. According to Piaskowski, the Cash App records merely showed the balance on the account. Piaskowski testified she had not seen proof that Mother had been employed for six months and she was not confident that Mother could meet the children's basic needs if returned to her. Mother also provided paystubs from a part-time job dated November 2022.

On cross-examination, Piaskowski testified she had seen Mother's cosmetology license and she believed that Mother had the ability to earn an income and support herself. When asked about Mother's ability to support the children, Piaskowski testified that she saw beds for the children when she visited Mother's home.

Piaskowski testified that Mother's FSP also required her to demonstrate six months of stable housing. According to Piaskowski, the case was initially scheduled for trial in March 2023. In March 2023, Mother told Child Advocates she was living in an apartment, and she provided them with a copy of the lease. On March 28, 2023, Piaskowski and Martinez went to the address listed on the lease but there was "no one by her name at that address" and the leasing manager for the apartment

complex informed them "they had no records of anyone by [Mother's] name living there."

Mother provided a lease for her current home, but Piaskowski and Martinez could not visit Mother's new home until May 19, 2023. Piaskowski testified that she agreed with Martinez's description of the home. Piaskowski admitted that Mother had stable housing since February 2023, and she agreed that Mother's living conditions had "significantly changed for the better" since the children had come into the Department's care in January 2022.

With respect to the FSP's requirement that Mother submit to random drug tests and, if she tested positive, to complete substance abuse services, Piaskowski testified that Mother's substance abuse assessment recommended substance abuse education. Despite being in treatment, Mother often refused to submit to drug-testing.

According to Piaskowski, Mother never acknowledged that she physically abused her children or that the children's maternal grandmother physically abused her children. She also never acknowledged that her brother had sexually assaulted Julie, "that the condition in the home the children were removed from was deplorable," "the children did not have enough food," or that "she abandoned the children for days at a time." According to Piaskowski, Child Advocates was

concerned that Mother had not acknowledged these problems and it made it difficult to assess whether Mother had corrected the problems.

Piaskowski testified Child Advocates had considered recommending therapy for Mother and the children, but they decided against it because "the children's therapist at the time stated that it would not be productive to the children's current health and well-being in their current placement to begin having contact with their mother again."

Piaskowski testified that Child Advocates was recommending that Mother's parental rights to the children be terminated, and the children be placed in "an unrelated permanent placement with the goal of adoption to give them some permanency." When asked why Child Advocates was recommending an unrelated adoption for the children, Piaskowski testified,

> Through a variety of factors that have influenced this case over the course of a year and a half. Many of the options for placement, related and unrelated, have changed. At this time it appears that all of the roads that we as Child Advocates and that [the Department] have gone down to try to accomplish the previous goal of family reunification, and then the other alternative goal of relative or fictive kin conservatorship did not pan out. And, so, at this time we are pursuing our current goal of unrelated adoption.

> With regard to the children's aunt, [Aunt K], Piakowski testified that the first time [Aunt K] asked to be considered for placement "the process was started but was not able to be completed due to her lack of willingness to take a drug test" and the aunt recently refused to take a hair follicle test.

### 4. Mother

#### (1) Reasons for Removal

Mother testified that Mike, Julie, Jack, John, Mark, and Ivan were removed from her home because someone reported seeing a suspicious person when Mike and Jack were walking to Sonic, and the police took Mike and Jack to Mother's home when she was not present. Mother denied that there were concerns with the condition of the home that led to the children's removal from her care. She admitted, however, that Whitely told her she was concerned about what she saw in Mother's home.

Mother testified that she was at school studying to be a cosmetologist when the police found the boys walking to Sonic. Mother also testified that she was braiding someone's hair when she received the call from Whitely. According to Mother, the Department was able to get in touch with her immediately when the children were removed from her home. When asked if the Department had made several unsuccessful efforts to contact her before finally reaching her, Mother testified that she answered the first phone call she received, and the call was from Whitely. Mother testified that she immediately tried to find a way home because she had left her Porsche at home, and she was home no more than forty-five minutes after receiving the call.

When she arrived at the home, Mother was arrested and charged with child abandonment. She was not allowed to go inside the home or speak to the children. Mother denied that she left the children home alone and claimed that she left her "Uncle Phil" in charge of the children. According to Mother, Uncle Phil had been painting the home while she was out, and he left shortly before the Department arrived. Uncle Phil was not a member of the children's family, and Mother did not know Uncle Phil's real name other than his first name was Sherman.[7] Mother denied having sex with Uncle Phil or anyone else in front of the children. She was surprised to hear that Mike said no one had been to the home in months.

With respect to the conditions inside the home, Mother testified that the photographs Whitely took did not accurately depict the home. Mother testified she was leasing the home with an option to buy it and the family had been living there for about two years when the children were removed. She started remodeling the interior of the home in late January 2021 because it needed new paint, new carpet, and some work done in the kitchen.

Mother, who agreed that it was her responsibility to keep a hygienic residence for the children, claimed the home always had running water, WIFI, electricity, and

---

[7] According to Mother, "Uncle Phil comes from like the Fresh Prince. It's a term like a mentor that helps out with the family."

gas and she denied that the home was infested with bugs or rodents. Although Mother had seen a few roaches, there were no rats in the home.

With regard to the lack of beds for the children in the home, Mother testified that there were seven beds in her home when the children were removed from her care. She claimed that most of the furniture had been moved into the garage so that they could paint and install new carpeting. Mother testified that Mike's statement that there was only one bed in the home was not true and that the photographs depicting only one bed in the home for the children to share were inaccurate depictions. But Mother also later testified that she and all six children slept in her room on her California king microfiber bed while they were remodeling the home.

When asked if she was concerned that the Department observed "feces in the sink and the toilet," Mother testified that she was concerned about the situation in the children's bathroom and claimed it had only been in that condition for a week and that another bathroom in the home was working. Mother stated the toilet in the children's bathroom was clogged because Ivan had flushed his diaper. When Mother tried to plunge the toilet, "it backed up into the sink," so she called someone with more experience to fix it. Mother testified that although it was an older home and there were some issues with the home when they moved in, they did not have any problems with the plumbing until Ivan flushed his diaper down the toilet. Mother said the contractors broke the sink.

40

Mother agreed that it was her responsibility to ensure that the children had enough food to eat and she disputed the allegation there was no food in the home. Mother testified that the home was stocked with food when the children were removed. Although it was normally kept in the kitchen, Mother put all food items in the master bedroom closet because the kitchen was being remodeled. She claimed that she also "made arrangements for the children to eat" and had food delivered. Mother testified that the children could text and call her when she was gone, and the children did not tell her they were hungry the day they were removed. Mother knew that the children pooled their piggy bank money to buy food for themselves, but she did not know Mike was concerned that Ivan would starve to death.

When asked about the injuries and scars the Department had observed on Mike and Mark, Mother denied causing the boys' injuries and she disputed Mike's and Mark's statements that she was responsible for the marks on their bodies. She testified the boys' allegations were untrue. Mother testified that the substantial scarring on Mike's back was from football.

When asked if she recalled the photographs previously admitted during a show cause hearing reflecting Mark's injuries, Mother testified she did not recall seeing any such photographs. She claimed she did not attend the show cause hearing and she denied stating that Mark's injuries were self-inflicted. The photographs of Mark's injuries were admitted into evidence at trial. When asked about a large scar

41

on Mark's leg, Mother claims Mark had scratched his leg on a nail in the fence while he was playing football with his brothers. When asked about an injury to Mark's large toe, Mother claimed Ivan had dropped a dumbbell on Mark's foot.

Mother was surprised to hear that the "children were reported to be very dirty, they smelled, and lot of their hair had to be cut because it was so matted." Mother denied that their hair was matted and claimed she required the children to bathe and brush their teeth every day. Mother claimed she took the children to a dentist every six months or year. She admitted, however, that she "didn't do the best job of the dentist appointments." Mother did not know that Mark had seven cavities when he entered the Department's care and that Mike and Julie also needed extensive dental work. When shown a photograph of the inside of Ivan's mouth, Mother acknowledged there were some cavities visible to the naked eye. She disagreed that Ivan, who was three years old, was drooling significantly when he came into the Department's care. She did not know that Ivan's dentist stated Ivan had been drooling because he had an infection, and it was likely very painful for Ivan to eat.

Mother was also surprised to learn there were concerns about Jack's hearing because Jack had no trouble hearing when he lived with her. Mother knew Jack had an eraser removed from his ear and that it had been there for years, but she was unaware he had "bilateral wax in his ears which could have impacted his hearing."

42

Mother testified that the children had been in Willis ISD until the end of the 2018-19 school year. Mother began homeschooling the children in 2019. According to Mother, the children, who were in school about eight hours per day, would use a device with an "app that was at their grade level" to study English, math, science, and history and their physical education consisted of various outdoor activities. Mother testified that she had twelve devices for the children to use for home school, and that Mike's statement that the children had to share one iPad for homeschooling was inaccurate.

Mother testified that the children would use their homeschooling apps while she was at cosmetology school, and she could view the children's school activity through an app on her phone. Mother claimed that while she was away, her aunt, who was a teacher, would come by the home to check on the children and tutor them. Mike, however, reported that no one had been to the home for months.

Mother testified that she was surprised to learn that Mike, Julie, Jack, John, and Mark struggled academically when they re-entered the school system after they were taken into the Department's care. Mother acknowledged that Mike had always been more focused on sports, and he needed to be reminded continually about the importance of academics. But Mother was skeptical about Julie because Julie had always been an "overachiever."

Mother did not know that Mark had to repeat second grade due to deficits in reading and she was surprised to hear that Jack's reading level was at least one year behind his peers. Mother claimed that Jack had caught up to his reading level in 2019 while he was attending Willis ISD. Mother did not know that Jack had been diagnosed with dyslexia after coming into the Department's care and that his academic performance had improved after receiving special accommodations in school. According to Mother, she had Jack tested for ADHD and dyslexia, and although he was diagnosed with ADHD, the specialist determined he was not dyslexic. She also testified that Jack was the only one of her children with special medical needs. Mother testified that she would not continue to homeschool the children if they were returned to her, and she planned to enroll them in a twenty-four-hour daycare that is located close to her home.

Mother testified that Ivan "wasn't nonverbal [while in her] custody" and she claimed he spoke in complete sentences. Mother believed that Ivan should have a relationship with Father J. Father J, however, did not visit Ivan while he was in the Department's care or participate regularly in the case. The Department also had trouble maintaining contact with Father J. The record reflects that Father J had been convicted of three violent crimes: deadly conduct (April 2014), assault of a family member by impeding breath (December 2014), and assault of a family member with

44

a previous conviction (June 2020). Martinez testified that Ivan's siblings stated they were scared of Father J, because Father J used to beat up Mother.

### (2) Mother's FSP

Mother testified that she understood she needed to complete the services on her FSP to be reunited with her children. Mother testified she successfully completed individual therapy and attended parenting classes. According to Mother, she learned skills from her therapy, and she actively participated in her parenting classes, where she learned new ways to create routines for her and the children, respond to different situations and personality types, and otherwise create a good environment for the children. Although Mother believed she already was a good parent, she testified the parenting classes made her a better parent. On July 24, 2023, the last day of trial, Mother testified that since the previous day of trial on June 5, 2023, she had started taking an online class for caregivers of special needs children, even though the classes were not required by her FSP.

With regard to her FSP's requirements that she submit to drug testing and attend a substance abuse program, Mother testified that she participated in substance abuse classes during which she learned more about her drugs of choice, CBD and marijuana. On May 15, 2023, the first day Mother testified, she claimed that she had not used marijuana or CBD since December 2022. However, when she testified on July 24, 2023, the last day of trial, Mother admitted she had used marijuana in late

May 2023 or early June 2023. She testified that since the last court hearing, she had started an outpatient program for her marijuana use and she was taking an online class for caregivers of special needs children, even though the Department had not asked her to take such a course. Mother testified that although she was informed she could probably get a medical card for her marijuana use, she told her therapist she wanted to find other ways to cope with her depression and anxiety. She had no problem taking a urine test that day, but she needed more time before she could take a hair follicle test because she needed to remove her hair extensions.

Mother's FSP required her to secure safe, stable, hygienic housing for a period of at least six months. With regard to her FSP's housing requirements, Mother testified that she signed a two-year lease for a three-bedroom, two-bath home with a large yard and that her monthly payment was $1,650. Mother claimed she had been living in the home since February 2023. According to Mother, the home is near a twenty-four-hour daycare, and she found an autistic-therapy provider close to her home. Mother testified that she purchased two bunk beds and two queen beds for the children, and by the last day of trial on July 24, 2023, Mother had "removed everything out the storage and got all the clothes and shoes and the belongings that belong to the children back in the house, got the rest of the mattresses."

Mother testified that she gave Martinez a copy of the lease for her new residence and Martinez came to the home about a week and a half before the May

46

15, 2023 trial setting. Although she allowed Martinez to observe the home, Mother did not allow Martinez to walk through the entire home because Martinez said the home smelled like marijuana. Mother testified that she told Martinez she wanted to "call the authorities to come do a walkthrough with her because I assured her there was no marijuana smell."

On June 5, 2023, Mother testified that Martinez and Child Advocates visited her new home. The home had six beds, but Mother was waiting for some of the mattresses that she had ordered to be delivered. Although she had initially set up her salon in one of the bedrooms, she moved the salon equipment "to the garage because I can use my living room now as the space to do my services versus the bedroom." Mother testified that she lived alone. When asked about the men's cologne and pill bottle Martinez and Child Advocates observed in her home, Mother testified that she wears men's cologne and the pill bottle belonged to an ex-boyfriend. When told the address she had given the Department in March 2023 was different from the address of her current home, Mother denied it.

With respect to the requirement in the FSP that Mother provide the Department with proof of her income from all sources on a monthly basis, Mother testified that she was attending cosmetology school when the children were removed from her home in January 2022. She worked as a waitress and a real estate agent before she went to cosmetology school.

By the time she testified at trial, Mother had graduated and was a licensed cosmetologist and she worked as a self-employed hairstylist fifteen to thirty hours per week. Mother testified that she operates a salon in her new home and that the salon is her primary source of income. A photograph of mother's salon was admitted into evidence. Most of Mother's clients pay with cash, but some use Cash App. Mother testified that her goal was to continue to work in the cosmetology field, offer different services, and have "a nice, functioning salon that helps ends meet in the end."

Mother testified that she raised Mike, Julie, Jack, John and Mark alone for eight years and Ivan for one year and she was responsible for 95% of the children's expenses, including food, shelter, clothing, and medical care. Although Ivan's father, Father J, had helped her financially and did things with the children, Mike's father, Father G, had provided no support. Mother, who had been leasing a Porsche when the children came into care, acquired an SUV before trial concluded.

Mother, who was charged with abandonment, was prohibited from having any contact with the children. The no-contact order in her criminal case was lifted when the charge was dismissed in February 2023. When asked if the court in the present case had lifted its no-contact order, Mother testified that the only "no contact order I'm aware of is criminal. I have no idea about any other no contact order in place."

48

She denied ever hearing the trial judge say during any of the hearings held in the present case that she was not to have contact with the children.

On May 15, 2023, Mother denied seeing Mike outside Father G's presence while the case was pending. When asked if she saw Mike in February 2023 when Father G was not there, Mother said she could not recall. When asked if she had seen Mike at a Wal-Mart within the last month, Mother testified she had no contact with Mike "to [her] knowledge." After being shown a video of her and Mike with Wal-Mart in the background, Mother was again asked if she had seen Mike within the last six months, and Mother testified she could not recall.

On June 5, 2023, Mother testified that she "met with [Mike] at a Walmart off of West Road" one evening. Mike was going to a party and he had friends with him. Mother claimed that Mike reached out to her because he wanted to see her. Mother testified that although she has never given Father G any money for Mike's support, she gave Mike hundreds of dollars in person and through Cash App in 2023. Mother testified that Mike calls her "almost every day" and he often asks for money because there is no food in Father G's home. Mother testified that she tried to provide support for the other five children, but the caseworker would not allow it.

Mother believed that Mike was a truthful person, and she was concerned that Mike had made inaccurate statements about her and their living conditions while they lived with Mother. Mother denied telling the youngest five children that it was

49

Mike's fault they were in care because he cooperated with the Department. Mother also denied that she instructed the children to lie to law enforcement.

Mother said she had "no record" of contacting Julie and she denied asking Julie to speak to the younger siblings about this case. Mother also denied making any promises to Julie or giving Julie a cell phone. In response to Julie's claims that she was sexually abused by her maternal uncles and that Mother was aware of the abuse, Mother claimed she took Julie to the hospital after she made an outcry about her "first biological father," and there had been no outcries since then. Mother denied that Julie ever told her she had been sexually abused by Mother's brothers.

Mother believed she would be reunited with her children if she completed her FSP to the best of her ability and she believed she was a better person for having completed her services. She loved her children, she missed them tremendously, and she wanted to be reunited with them. Mother testified that she never intended to neglect or abandon her children and if given another chance, she would do everything in her power to prevent the children from being removed from her care.

Mother testified that she and her children were "very, very close." She does not "really hide too much from them" and they have a "very open relationship." Mother testified she is especially close to her daughter, Julie, and they "have done a lot of hobbies and activities together." According to Mother, Julie views her as a role model and wants to be like Mother when she grows up. Mother testified that

her sons are protective of her, and Julie and the boys like music and playing sports. According to Mother, the family spends a lot of time together and they are "very, very, very, very close."

Mother testified that if the children were not returned to her care, it would be in their best interest to be placed together with a family member. Mother told the Department that her sister, Aunt K, was a possible placement for the children. According to Mother, Aunt K was willing to take all the children, and Mother testified that she would provide support to her sister. Mother also testified she was willing to participate in family therapy with the children.

### 5. Shanequa Davis

Shanequa Davis was assigned as the children's caseworker on June 19, 2023. Davis testified that Julie, Jack, John, and Mark were placed in an emergency shelter, and they had been there for almost thirty days. Ivan was in a foster home. All of the children's basic needs were being met in their current placements. Davis testified that Mike was still placed with Father G, "everything is fine in their home," and the Department has no plans to change the placement.

The Department identified Margaret Florence as a potential placement for Julie, but after reviewing's Florence's home study, the Department has additional questions for Florence. Julie told Davis that "she will miss her siblings, but she really wants to be placed with Ms. Florence," and Jack, John, and Mark told Davis

51

that they want to be placed together. According to Davis, the children want to see Mother, but Jack, John, and Mark do not want to live with Mother. Mark told Davis he wanted to be placed in a foster home that was "going to care for him; not the previous one that he was in before going to the shelter." When asked if separating the children from their parents and siblings could cause the children emotional and mental stress, Davis testified that "in the beginning there was some emotional distress going on; but just recently, when I visited with the caregivers, as well as the facility that has all the therapies and everything, the children are thriving and doing well."

After reviewing the case record, Davis believed that Mother had completed all of her services, and Davis agreed that by completing her services, Mother had shown that she is "taking this case very serious in working towards reuniting with her children." Davis, however, had not had an opportunity to visit with Mother because Mother was only available via text and would not answer her phone calls.

### 6. Lindsey Cason

Lindsey Cason, Mother's substance abuse counselor, testified that the children came into the Department's care due to neglectful supervision and physical abuse. Cason worked with Mother from the end of October 2022 until May 2023, but there was a "lapse of engagement" in January and February 2023.

According to Cason, Mother was discharged successfully from the substance abuse program on May 9, 2023. Mother's last drug test, before her discharge, was on March 5, 2023. According to Cason, Mother's urine sample tested negative, and although her hair follicle test was positive, the amount detected in Mother's hair had "decreased at that time." Although Mother had one drug test pending at the time of discharge, Cason discharged Mother because, based on Mother's February 2023 and March 5, 2023 test results, Cason had no reason to believe that Mother was still using drugs. But Cason did have some hesitancy discharging Mother on May 9, 2023 "due to her lack of consistency in all of her drug screenings just overall, as a whole."

After Mother was discharged, Cason received additional test results. Mother's urine and hair follicle samples tested positive for marijuana use. When asked if Mother took responsibility and acknowledged that drugs were a concern in the case, Cason testified that Mother did "towards the end." Cason testified that if she had known Mother's latest test results had tested positive for marijuana, she would not have discharged Mother from the substance abuse program.

On cross examination, Cason testified that when assessing whether to discharge Mother on May 9, 2023, Cason considered that Mother had "become more cooperative in her services as far as being more engaged and completing her personal assignments," Mother had "finished her treatment objectives by that time," Mother "successfully looked at each individual topic" with Cason, Mother "verbalized how

53

her marijuana use had impacted her life in the case of her children," and her drug tests in February 2023 and March 2023 were negative. According to Cason, it appeared to her that Mother "had more understanding of the harmful effects of doing that behavior," and she was "doing better during that time she was with me."

Cason testified that Mother's substance abuse counseling was specifically for marijuana. When asked about the negative effects marijuana use has as it relates to caring for children, Cason testified that they consider marijuana a drug, and drug use can have a variety of physical and mental side effects, including "emotional instability or not being present for children to tend to their emotional needs." When asked if there were specific side effects of marijuana use, Cason testified it depended in part on which strain the person was using, but generally when someone is high on marijuana their "inhibitions are going to be lowered and their "judgment is going [to be] impaired."

According to Cason, Mother was using the Delta 9 and CBD. Cason testified that while pure CBD is not supposed to be a psychotropic, some CBD products, including the ones Mother was using, have trace amounts of THC, which make the product more psychotropic. Mother told Cason she was using CBD to reduce her anxiety and depression. When asked if CBD use by parent is dangerous, Cason testified that she does not "recommend CBD use just because . . . it's not regulated" and they do not "know how much THC is contained in those products." Cason

testified that Delta 9 is "another form of marijuana" that some people believe is legal because some of the physical components have been changed. Cason, however, was "not too sure of the legality" of Delta 9 because "they've gone back and forth with trying to outlaw it and keep it in the stores; but I know it still contains THC, which is the issue at hand." Cason testified that the lapse in Mother's treatment occurred because they had to obtain a new agreement before Mother could continue receiving services.

### 7. Dr. Dorothy Florian-Lacy

Dr. Dorothy Florian-Lacy is the therapist for Jack, John, and Mark. Dr. Lacy testified that she began meeting with Jack, John, and Mark in January 2023. When asked why the children were in the Department's care, Dr. Lacy testified that "their biological father died approximately 2-1/2 years ago, and the mother had some difficulty with providing for their needs." Dr. Lacy testified that the kids exhibited behaviors consistent with neglect or abuse, including an "inability to perform academic tests commensurate with their age or grade level," "a very difficult time with their attention span, focusing, following the daily routine of home life, and just following directions in general."

On cross examination, Dr. Lacy testified that the boys' father, Father Y, had committed suicide in front of them and that such trauma could lead to some of the behaviors she witnessed. According to Dr. Lacy, it is "hard to tease out what alone

55

would result in those kinds of behaviors." In addition to the death of their father, the boys had experienced other traumatic events, such as "[i]nconsistent parenting; having an absent parent that perhaps is not available due to substance abuse; traumatic experiences with food and security," and multiple changes of residence. According to Dr. Lacy, trauma "can be one incident, but it also can develop over time."

According to Dr. Lacy, the children told her they had not gone to school for almost two years. She testified that the lack of schooling harmed Jack the most because he was the oldest of the three siblings. Dr. Lacy testified that Jack is "so embarrassed about not being able to read, that he kind of refuses and shuts down." When asked if Jack had improved while in the Department's care, Dr. Lacy testified that Jack "can learn, he's capable of it, but he needs a lot of one-on-one and kind attention to help him get the basics." John wants to learn as well, and Mark, the youngest of the three, is "closer to grade level than his two brothers."

Dr. Lacy testified that food and security were of significant concern when the children came into care. According to Dr. Lacy, the "issue of food security came up quite often." Dr. Lacy testified that she often visited Grandmother's home at mealtime and the children were "incessant about having, oh, additional food, as well" and Grandmother would "leave the snacks in the car or they would be consumed entirely in one day." When asked if Jack, John, or Mark discussed

56

whether they had sufficient food at home when they lived with Mother, Dr. Lacy testified that the boys "love their mother very much; and with that, they wouldn't speak about any problems that existed." According to Dr. Lacy, the boys were "in denial" and they blamed themselves and each other for a lot of things, such as the messiness of the home and arguing over "what toys belonged to who" and "who ate the last of the chips." Dr. Lacy believed the children had experienced food insecurity because they would hoard food and take food without permission. The boys did not disclose to Dr. Lacy any physical or sexual abuse.

Dr. Lacy testified that Jack, John, and Mark were "very thin" when she first met them, but now they were "very healthy-looking." When they came into care, the boys did not go to school or have "wholesome, age-appropriate activities." Dr. Lacy testified that although she brings activities for her sessions with the boys, they "hardly wanted to talk to me because they wanted to get back and be with their peers, which, again, I found as growth." According to Dr. Lacy, Jack, John, and Mark "really seem to enjoy their current placement," a youth ranch. Dr. Lacy testified that she had not met with Mother because she was directed to do therapy with the children, not family therapy.

### 8. Margaret Florence

Margaret Florence, who is 73 years old, testified that her son had dated Grandmother, and Florence had known all six of Mother's children since they were

57

born. Florence testified that she took care of Julie from "four months until she was three years old" and she was willing to adopt Julie. Florence testified she was unable to care for the boys, but she was looking for other family members who could do so.

## D. Closing Arguments

In its closing argument, the Department asked the trial court to terminate Mother's parental rights to Julie, Jack, John, Mark, and Ivan under Subsections (D), (E), (J), (O), and (P) of the Texas Family Code. According to the Department, termination of Mother's parental rights was warranted based on the children's condition when they came into care, their disclosures of physical and sexual abuse, and the food insecurity the children experienced while in Mother's care. The Department argued that although Mother had satisfied portions of her FSP, Mother had not provided the Department with adequate proof of income, and she had tested positive for drugs throughout the pendency of the case, including after she completed the substance abuse program required by her FSP. According to the Department, it was not apparent that Mother "entirely learned from the family plan of service or alleviated the concerns." The Department also argued that while Mother testified she had enrolled the children in home school, she also testified there had been "a lapse between [the time] they were enrolled in school and [the time] they were enrolled in home school."

Unlike the five youngest children, the Department did not ask the trial court to terminate Mother's parental rights to Mike. Instead, the Department asked the trial court to name Father G as Mike's primary managing conservator, Mother as Mike's possessory conservator, and to order "visitations as agreed upon between the parties."

In her closing, Mother argued that in addition to all of the services required by her FSP, she had also completed additional services on her own volition, and she had "made an effort throughout the pendency of this case to reunite and rehabilitate herself and her home to make sure that [her] children ha[d] a place to come back to." Mother argued that she is able to support herself financially, she had shown stability throughout the pendency of this case, and she had a stable home for the past several months, as evidenced by the lease she provided to the Department. According to Mother, the Department's "entire case" was based on "the conditions in the home prior to removal and [the Department had] not been able to show that these issues are still a concern at this time" because her new home "has been rehabilitated and it is suitable for children to live."

Mother argued that she "has taken full responsibility . . . for the actions or the cause of why these children came into care" and her testimony that she "gained insight from the classes, the substance abuse classes, the therapy, and the counseling

59

that she attended and completed successfully," demonstrates that those classes had a "rehabilitative effect on her."

Mother argued that Julie, Jack, John, and Mark's father, Father Y, committed suicide and Ivan's father, Father J, was "just not present." According to Mother, the children are bonded with her, and it would be "tremendously traumatic" for the children to lose her, their only remaining parent.

With regard to Ivan, Mother argued that she had "taken it upon herself to go above and beyond to care and to seek information and to seek counseling on how to care for her child with a disability and put [Ivan] in a position that she is able to assist and help." Mother argued that Florence and Aunt K were willing to help and support her.

Mother asked the trial court to not terminate her parental rights to Julie, Jack, John, Mark, and Ivan and she argued that it was in their best interest "to be on a road or a plan or path to be reunified with their mother; and, if not, be placed in a home that is suitable that is a family relative that can take these children [who] have no permanent placement and no plan for permanent placement."

In his closing argument, Father J asked the trial court not to terminate his parental rights to Ivan because he was not the reason Ivan had come into the Department's care. He argued he wanted a legal relationship with Ivan, and he had "provided some support along the way."

In his closing argument, Father G agreed that Mother's rights to Mike should not be terminated. He argued that any visits between Mother and Mike should be supervised and "only as mutually agreed." Father G asked the court to name him as Mike's permanent managing conservator, change Mike's surname to Father G's surname as Mike requested, and order Mother to pay "minimum wage child support" for Mike.

In her closing, the children's attorney ad litem, Laura Neilsberg, informed the trial court that Mike requested that Mother's parental rights to him be terminated. According to Neilsberg,

> [Mike] has requested that his mother's parental rights be terminated, based on the living conditions of the home, the fact that he was responsible for the care of his siblings . . . due to the abuse and neglect of his mother, the neglect of his education, and the physical and emotional abuse that he suffered at the hands of his mother. The Department has shown by clear and convincing evidence the grounds for termination.
>
> . . . .
>
> It is in [Mike's] best interest.
>
> [Mike] is asking for termination. He is asking for the Court to validate the trauma that has been experienced by himself. And he is asking to be the one in charge of any relationship he may or may not have with his mother.

Neilsberg argued that termination of Mother's parental rights to Mike was also warranted because Mother had not shown that she had a stable living environment or provided proof of income or that the children attended school from

61

2019 to 2021. According to Neilsberg, Mother "has no excuse for the condition the children were living in, the fact that they did not have adequate food to eat, or the fact that they had scars all over their bodies" when they came into the Department's care, and Mother tested positive for drugs after she completed her required substance abuse program. Based on these facts and evidence, Neilsberg asked the trial court to terminate Mother's parental rights to Mike under Subsections (D), (E), (O), and (J), and to appoint Father G as Mike's sole managing conservator. With regard to Ivan, Neilsberg asked the trial court to terminate Mother's parental rights to Ivan under Subsections (D), (E), and (O). Neilsberg argued that Ivan, who was four years old, autistic, and "barely verbal," was the "most vulnerable child in this case." She argued it was in Ivan's best interest for Mother's rights to be terminated because Mother could not meet his basic needs or his special needs. Neilsberg argued that when Ivan came into the Department's care, he was underweight and had "several cavities and a mouth infection which made it difficult for him to eat."

With regard to Julie, Jack, John, and Mark, Neilsberg argued that although the Department had shown by clear and convincing evidence that there were grounds for termination, the children had indicated they wanted to have a relationship with Mother and Julie wanted to be reunited with Mother. Neilsberg argued that if the trial court did not terminate Mother's rights to Julie, Jack, John, and Mark, the

Department should be named as the children's permanent managing conservator and their visitation with Mother should be "limited to supervised, therapeutic visits."

The children's co-attorney ad litem, Derrick Reed, told the trial court that he agreed with Neilsberg that Mother's rights to Mike and Ivan should be terminated. With regard to Julie, Jack, John, and Mark, Reed argued that Mother had not "admitted or even shown any remorse as to the things that have been presented during this trial," including the "deplorable conditions" of her home. Mother also violated the court's order by meeting with Mike in the Wal-Mart parking lot, and although she had completed the requirements of her FSP, she had not shown "any want to change what she put these children through." According to Reed, it was not in the best interest of Julie, Jack, John, or Mark to be returned to Mother's care. Reed asked that Julie, Jack, John, and Mark be placed in a "foster placement where they are getting three meals a day, where they are in good living conditions," and that if the trial court did not terminate Mother's rights to the children, any visits between Mother and the children be supervised.

On September 3, 2023, the trial court signed a final decree terminating Mother's parental rights to Mike pursuant to Subsections (D), (E), (O), (J), and (P), appointing Father G as Mike's sole managing conservator, and granting Mike's request to change his surname to Father G's surname. The trial court terminated Mother's parental rights to Ivan pursuant to Subsections (D), (E), (O), (P), and

appointed the Department as Ivan's sole managing conservator.[8] The trial court

appointed the Department as sole managing conservator for Julie, Jack, John, and

Mark, and it appointed Mother as their possessory conservator, awarding Mother

supervised therapeutic visitation with the children once a month, and ordering

Mother to pay monthly child support for Julie, Jack, John, and Mark.

This appeal followed.

## Best Interest of the Child

In her sole issue on appeal, Mother argues there is legally and factually

insufficient evidence supporting the trial court's finding that termination of her

parental rights was in Mike's and Ivan's best interest. *See* TEX. FAM. CODE

§ 161.001(b)(2).

## A. Standard of Review

A parent's rights to the "companionship, care, custody, and management" of

his or her child is a constitutional interest "far more precious than any property

right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't

of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex.

2003). The United States Supreme Court has emphasized that "the interest of [a]

parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest

---

[8] The trial court also terminated Father J's parental rights to Ivan pursuant to Subsections (D), (N), and (O).

of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted); *see also In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023) ("Both this Court and the Supreme Court of the United States have long recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20.

In a case to terminate parental rights under Texas Family Code Section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated predicate acts or omissions justifying termination and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there

is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under Section 161.001(b)(1) and that termination was in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d at 266. We examine all evidence in the light most favorable to the finding, assuming the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266. We must also disregard all evidence that the factfinder could have reasonably disbelieved or found not to be credible. *Id.* But this does not mean we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

When conducing a factual sufficiency review in a termination case, we must consider the entire record. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674

66

(Tex. 2020); *In re J.F.C.*, 96 S.W.3d at 266. We assume "that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *In re Commitment of Stoddard*, 619 S.W.3d at 674 (citing *In re J.F.C.*, 96 S.W.3d at 266). Unlike a legal sufficiency review, when assessing the factual sufficiency of the evidence, we cannot disregard disputed evidence that a reasonable factfinder could not have credited in favor of the finding. *In re Commitment of Stoddard*, 619 S.W.3d at 674 (citing *In re J.F.C.*, 96 S.W.3d at 266); *see also In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018) ("The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered."). Rather, we must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *In re Commitment of Stoddard*, 619 S.W.3d at 674 (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under both legal and factual sufficiency standards, the trial court is the sole arbiter of a witness's credibility and demeanor and the weight of the evidence. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## B.    Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *See In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest

of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for permanence through establishment of stable, permanent home is "the paramount consideration in best-interest determination").

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*,

374 S.W.3d at 533. Similarly, lack of evidence for some of the *Holley* factors does not preclude a fact finder from reasonably forming a strong conviction or belief that termination is in the children's best interest. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *In re J.G.S.*, 574 S.W.3d 101, 122 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

We may also consider the statutory factors set forth in Texas Family Code Section 263.307, including (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

A parent's past conduct is probative of his future conduct when evaluating a child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San

Antonio 2013, no pet.); *see also Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.); *see also In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003, pet. denied) (same).

Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating finding under Section 161.001(b)(1)(O) can support best interest finding); *In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest). The trial court is given wide latitude in determining the best interest of the children. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

## C.    Analysis

Multiple factors support the trial court's findings that termination of Mother's parental rights was in Mike's and Ivan's best interest, including Mother's history of endangering her children, who experienced profound neglect and physical abuse while in Mother's care, her ongoing drug use, her inability to provide a safe and stable home for the children, and her inability to provide her children with a safe and stable home. *See In re C.H.*, 89 S.W.3d at 28 (holding that evidence may be probative of Section 161.001(1) grounds and best interest); *see also In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child.").

With regard to the present and future emotional and physical dangers to Mike and Ivan, the evidence shows that Mother repeatedly allowed Mike, Ivan, and their siblings to live in unsafe and unsanitary conditions, neglected the children's personal hygiene and medical and dental needs, physically abused the children, and exposed the children to domestic violence.

The police who first discovered the children at Mother's home alone in January 2022 and the Department caseworker who investigated the officers' allegations of neglect described Mother's home as "unsuitable" and "not livable for the children." The home was filthy, smelled of urine, and it was filed with bags of

71

trash, infested with rats and cockroaches, and had "loose wiring" hanging out the walls. The toilet and sink in the children's bathroom were filled with urine and feces. There was no running water in the home or food in the kitchen or deep freezer, and there was one mattress on the floor in the master bedroom which Mother shared with her six children. The Department also found Mike, Julie, Jack, and John living in similar "deplorable conditions" in March 2014. According to the referral, Mother's home was "nasty," there was a "stench as you walk into the home," it was littered with clothes "and stuff," and it did not have "a sink, a bathroom shower or tub." This evidence supports the trial court's findings that termination of Mother's parental rights was in Mike's and Ivan's best interest. *See In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *16, 18 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (holding evidence parent allowed child to live in unsanitary conditions supports endangerment finding under Section 161.001(b)(1) and best interest finding under Section 161.001(b)(2)); *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *18, 22 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (same); *see also Holley*, 544 S.W.2d at 372 (identifying present and future emotional and physical dangers to child as best interest factor). The trial court could also infer from this evidence that such endangering conduct could reoccur in the future if the children were returned to Mother's care. *See In re*

*B.K.D.*, 131 S.W.3d at 17 (stating fact finder may infer that past conduct endangering child's well-being may recur in future if child returned to parent).

Aside from the children's unsanitary living conditions, the record reflects that Mother repeatedly neglected the children's personal hygiene and physical condition while under her care. In May 2019, Julie's teacher reported that Julie's hygiene had been deteriorating since early April 2019, and that her clothes had a "very strong urine smell." Father G stated that when he saw Mike in 2020, Mike smelled like mildew, his hair was smelly and matted, and Mike told Father G that he had gotten into trouble recently for taking a bath. When they were removed from Mother's home in January 2022, Mike, Ivan, and their siblings "had a strong, musty, urine and filth stench," they were wearing smelly, soiled clothing, they had trash or debris stuck in their "severely matted" hair and they were underweight for their ages. It was apparent to the police and to Whitely that none of the children had bathed "for quite some time." This evidence that Mother neglected her children's personal hygiene also supports the trial court's best interest findings. *See In re J.H.*, No. 01-22-00629-CV, 2023 WL 2169952, at *14, 18 (Tex. App.—Houston [1st Dist.] Feb. 23, 2023, pet. denied) (mem. op.) (holding "evidence of unsanitary and dangerous conditions in a child's home as well as evidence that a parent has neglected her child's physical condition" supports endangerment finding under Section 161.001(b)(1)(D) and best interest); *see also In re S.B.*, 597 S.W.3d 571, 584 (Tex.

App.—Amarillo 2020, pet. denied) ("Allowing children to live in unsanitary conditions and neglecting their physical condition can constitute endangerment."). The trial court could also infer from this evidence that such endangering conduct could reoccur in the future if the children were returned to Mother's care. *See In re B.K.D.*, 131 S.W.3d at 17.

There was also evidence that the children suffered physical abuse while they were living in Mother's home. Mike, Jack, and Mark made outcries of physical abuse by Mother and Julie collaborated their claims. Jack and Mark reported that Mother "used to whip them constantly with an extension cord," and when she grew tired of hitting them, Mother made them "stand in the corner for hours." According to Jack and Mark, Ivan was the only child that did not get whipped. Mike claimed that Mother had kicked him in the stomach and struck him in the head with a belt buckle, and if the children made Mother upset, Mike "got the worst" of the abuse. Julie agreed that Mother "beat on" Mike worse than the other children.

Martinez testified that she saw marks and bruises on all the children when they came into the Department's care. Among other evidence of physical abuse, Mike had substantial scarring on his back, Ivan had "excessive marks and scratches all over his body," including both old scars and "fresh" scratches, and Mark had scarring on his leg and arm. Evidence that Mother physically abused Mike supports the trial court's finding that termination of Mother's rights to Mike is in his best

interest. *See In re L.W.*, 2019 WL 1523124, at *11 (stating direct physical abuse of child constitutes endangering conduct); *see Holley*, 544 S.W.2d at 372 (identifying present and future emotional and physical dangers to child as best interest factor); *In re A.K.T.*, No. 01-18-00647-CV, 2018 WL 6423381, at *16 (Tex. App.—Houston [1st Dist.] Dec. 6, 2018, pet. denied). (mem. op.) (stating mother's history of violent abusive conduct directed at child, father, and other individuals supported best interest finding). A fact finder may infer that such endangering conduct may recur in future if the child is returned to the parent. *See In re D.M.*, 452 S.W.3d at 471 (stating fact finder may infer that past endangering conduct will recur if child returned to parent); *In re B.K.D.*, 131 S.W.3d at 17 (same). Evidence that Mother abused Mike and Ivan's other siblings also supports the trial court's finding that termination of Mother's rights to Ivan was in Ivan's best interest. *See In re D.T.*, 34 S.W.3d 625, 636–37 (Tex. App.—Fort Worth 2000, pet. denied) (stating parent's conduct with regard to other children can be used to support finding of endangerment even with regard to child born after such conduct occurred); *see generally In re S.G.S*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.) (reasoning that fact finder could infer from actual neglect of one child that physical and emotional well-being of other children was also jeopardized).

Julie also claimed that she had been sexually assaulted by two of her maternal uncles and although Mother was aware of the abuse, Mother did nothing about it.

75

*See In re A.B.*, 125 S.W.3d 769, 778 (Tex. App.—Texarkana 2003, pet. denied) (stating parent's "failure to protect the emotional well-being of the children following the allegations of sexual abuse" supports trial court's best interest finding). Although Mother denied causing the children's injuries or knowing that Julie had been sexually abused by her maternal uncles, it was within the trial court's province, as the sole arbiter of a witness's credibility, to disbelieve Mother's testimony and conclude, in light of the evidence, that Mother had physically abused the children and turned a blind eye to Julie's outcry of sexual abuse by Mother's brothers. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court is sole arbiter of witness credibility and demeanor). Mike told the Department that Father J, Ivan's father, "was not around much and it's a good thing" because Father J, who had been convicted of three violent offenses, was "abusive to [Mother] and [Mike] has seen him hit [Mother]." Such evidence reflects that Mother exposed her children to domestic violence and thus supports the trial court's best interest finding. *See In re K.K.*, No. 09-20-00300-CV, 2021 WL 2148857, at *4 (Tex. App.—Beaumont May 27, 2021, pet. denied) (mem. op.) (stating evidence parent's exposure of child to domestic violence supports trial court's finding that termination is in child's best interest); *see also* TEX. FAM. CODE § 263.307(b)(7) (identifying history of abusive or assaultive conduct by child's family as factor relevant to best interest analysis).

With regard to Ivan's and Mike's present and future physical and emotional needs, the record reflects that Mother failed to meet many of her children's basic needs, including providing adequate food and medical and dental care. "A child's basic needs include food, shelter, clothing, routine medical care, and a safe, stimulating, and nurturing home environment." *In re K-A.B.M.*, 551 S.W.3d 275, 288 (Tex. App.—El Paso 2018, no pet.); *see also Holley*, 544 S.W.2d at 372 (identifying present and future physical and emotional needs of child as best interest factor); TEX. FAM. CODE § 263.307(b)(12)(A) (stating parent's ability to provide child with "minimally adequate health and nutritional care" is best interest factor).

With regard to the children's nutritional needs, Whitely stated that there was no food in the kitchen or deep freezer when she inspected the home in January 2022, and the children told Whitely they were hungry and had not eaten since the previous day. Dr. Lacy noted that the children hoarded available food after they came into the Department's care and that food insecurity came up often in her conversations with Jack, John, and Mark. Whitely and Dr. Lacy agreed that the children were underweight when they came into the Department's care. Martinez testified that the children reported that, when they lived with Mother, "they were starved or didn't receive any meals, some days []they would fight over the food that was left," and they "would have to steal for food." The children also used their piggy bank money

to buy food for themselves. Mike stated that he was afraid Ivan would starve to death.

The record also reflects that concerns were raised about the availability and adequacy of food in Mother's home as early as 2019. In May 2019, Julie's teacher reported that Julie was severely underweight, and often asked to take food home from school. Father G told the Department that when he saw Mike in 2020, Mike was skinny, he appeared malnourished, and his leg bones protruded. Mike also told Father G that he went to bed without food some days.

Although Mother claimed there was always sufficient food in her home for the children, it was within the trial court's province, as the sole arbiter of a witness's credibility, to credit the children's and other witnesses' testimony over Mother's testimony about the availability of food in the home, and conclude, in light of the evidence, that Mother failed to provide her children, including Mike and Ivan, with enough food to meet their basic nutritional needs. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court is sole arbiter of witness credibility and demeanor).

The evidence demonstrates that Mother also neglected the children's medical and dental needs while they were in her care. A child's basic needs include medical and dental care and courts may consider evidence that a parent neglected to seek appropriate medical and dental treatment for her children when determining whether termination of the parent's rights is in the child's best interest. *See In re K.S.O.B.*,

78

No. 01-18-00860-CV, 2019 WL 1246348, at \*19 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.).

With regard to the children's medical and dental needs, Mother claimed she took the children to a dentist every six months or once a year. She admitted, however, that she "didn't do the best job of the dentist appointments." The record reflects that Mike needed intensive dental work when he first came into the Department's care. Mike told Whitely that he had been suffering from a toothache for two weeks and although he told Mother about his toothache, she did nothing to address it. Mark had seven cavities when he entered the Department's care and Julie also needed extensive dental work.

Ivan, who was three years old when he came into care, needed "fairly extensive [dental] work . . . due to neglect in the home of origin," and his first foster parent noticed that he "would take his food and stuff all the way to his back teeth to chew in the back because the front teeth appeared to be in such pain." Ivan, who had cavities visible to the naked eye, was also drooling significantly when he came into the Department's care. Ivan's dentist concluded that Ivan had been drooling because he had an infection, and it was likely very painful for Ivan to eat.

Mike was behind on his immunizations when he came into care, and he was not being treated for his ADHD. Jack had been having hearing problems and doctors found an eraser stuck in his ear, which had been there for years. Ivan, who was

79

diagnosed with autism, encephalopathy, and several developmental issues relating to neglect, was not receiving any treatment for his conditions while in Mother's care. Mother also claimed that Ivan, who was non-verbal when he came into care, "wasn't nonverbal in [her] custody" and she claimed he spoke in complete sentences.

The trial court could infer from this evidence that Mother failed to seek appropriate medical and dental treatment for Mike, Ivan, and her other children. *See In re K.S.O.B.*, 2019 WL 1246348, at *19 (stating evidence parent failed to seek appropriate medical and dental treatment for child supports best interest finding). The trial court could also infer that Mother's inattention to her children's medical and dental needs would continue in the future. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Mother's inability to meet her children's basic needs also constitutes endangering conduct. *See In re J.D.G.*, 570 S.W.3d 839, 852 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (stating neglecting child's medical and dental needs endangers child); *In re J.V.B.*, No. 01-17-00958-CV, 2018 WL 2727732, at *7 (Tex. App.—Houston [1st Dist.] June 7, 2018, pet. denied) (stating parent's failure to provide for child's basic need endangered child's well-being).

The child's need for a permanent home has been "recognized as the paramount consideration in a best interest determination." *In re B.J.C.*, 495 S.W.3d at 39; *see also Holley*, 544 S.W.2d at 372 (recognizing stability of home as best-interest

80

factor).  The record reflects that Mother did not move out of her home, which the police and Department deemed unlivable, until July 2022—six months after the children were removed from her care.  Mother, who claimed she stayed with a friend after she first moved out, did not provide the Department with an address or lease until February 2023.  Although she acquired a two-year lease for a home that was considerably better than her prior home, the lease did not commence until February 2023, which was over a year after the children were removed from her home.  While Mother claimed she had been living in the home since February 2023, she told the Department in March 2023 that she was living at an address in Crockett, Texas.

A parent's drug use is also indicative of instability in the home because it exposes the children to the possibility that the parent may be impaired or imprisoned. *See In re A.M.*, 495 S.W.3d 573, 579 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); s*ee also In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."); TEX. FAM. CODE § 263.307(b)(8) (including "whether there is a history of substance abuse by the child's family" among factors that "should be considered by the court" when "determining whether the child's parents are willing and able to provide the child with a safe environment").  The record reflects that, while this case was pending, Mother submitted nine urine and hair samples that tested positive for marijuana or marijuana metabolites, and she failed or refused to submit to thirteen

81

drug tests, all of which the trial court presumed were positive. *See In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (stating refusal to give hair sample permitted court to infer father refused testing because it would be positive); *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding fact finder could infer that parent's failure to submit to court-ordered drug testing indicated parent was avoiding testing because she was using narcotics). Mother also tested positive for drugs during trial and after she was discharged from substance abuse treatment. *See In re A.M.*, 495 S.W.3d at 580 ("[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, may support a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being.") (quoting *In re K.C.F.*, No. 01–13–01078–CV, 2014 WL 2538624, at *9–10 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (mem. op.)).

The evidence also establishes that Mother did not comply with her FSP. Although Mother's FSP required her to secure stable housing for a minimum of six months consecutively and throughout the duration of the case, she did not provide the Department with proof of stable housing until May 5, 2023, which was the first day of trial and over a year after the children were removed from her home. She also failed to provide the Department with proof of all sources of her income on a monthly basis, she tested positive for drugs even after being discharged from her

substance abuse program, and she failed or refused to submit samples for thirteen drug tests. *See In re M.R.*, 243 S.W.3d at, 821 (stating parent's failure to comply with FSP supports finding that termination is in child's best interest).

With regard to Mother's parental abilities, the record reflects that although Mother claimed she was home-schooling the children using online programs, her efforts were insufficient to meet the children's educational needs because she failed to provide the children with adequate resources and supervision. *See In re M.F.*, No. 01-17-00835-CV, 2018 WL 1630180, at *8 (Tex. App.—Houston [1st Dist.] Apr. 5, 2018, pet. denied) (mem. op.) (noting child was "behind her peers academically in almost every way, she barely knew her alphabet, and she could not write her name despite being almost seven years old" when discussing evidence of parental abilities for purposes of determining whether termination of parents' rights was in child's best interest); *see also In re A.O.M.*, No. 14-15-01012-CV, 2016 WL 1660630, at *6 (Tex. App.—Houston [14th Dist.] Apr. 26, 2016, pet. denied) (mem. op.) (considering parents' failure to ensure children were enrolled in school as evidence of parental abilities for purposes of determining whether termination of parents' rights was in child's best interest). The record reflects the children had to use a neighbor's WIFI to connect to the internet and, according to Mike, all five school-aged children shared one iPad for homeschooling. Mother, who attended school outside the home, also left the five school-aged children unsupervised when they

were ostensibly home-schooling. Mike told the Department that the children had not been in school for a "few months." Mike, Julie, Jack, John, and Mark struggled academically when they returned to a formal school setting. Mark had to repeat second grade due to deficits in reading and Jack's reading level was at least one year behind his peers. Ivan is autistic and developmentally delayed and while Mother started taking an online class for caregivers of special needs children and she found an autistic therapy provider close to her home, Mother did not do so until the middle of trial. She also claimed that Ivan, who was non-verbal when he came into care, "wasn't nonverbal in [her] custody" and she claimed he spoke in complete sentences, indicating Mother lacked an understanding or failed to recognize Ivan's developmental delays. *See* TEX. FAM. CODE § 263.307(b)(12)(F) (identifying as best-interest factor parent's parenting skills, which includes "an understanding of the child's needs and capabilities").

Mother's past endangering conduct is also an indication of her parenting abilities. *See In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *18 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) (citing *In re J.S.G.*, 2009 WL 1311986, at *9). Her use of drugs throughout the pendency of the case, including during trial, also indicates that Mother exercises poor judgment. *See In re S.G.*, No. 01-18-00728-CV, 2019 WL 1448870, at *5 (Tex. App.— Houston [1st Dist.] Apr. 2, 2019, no pet.) (mem. op.) ("Parental drug abuse also reflects poor

judgment and an unwillingness to prioritize a child's safety and welfare and thus may be considered in determining a child's best interest.").

Although Mother completed her parenting classes, planned to enroll the children in school if they were returned to her, and made an effort to educate herself regarding the care and resources that Ivan needed, it was the trial court's obligation to weigh all the evidence and assess the credibility of the witnesses, and based on all the evidence, the trial court could have concluded that Mother's efforts came too late and were insufficient to demonstrate she has good parenting skills. *See Holley*, 544 S.W.2d at 372 (identifying parental abilities of persons seeking custody as best-interest factor); TEX. FAM. CODE § 263.307(b)(12) (identifying party's parenting skills as best-interest factor).

Mother argues that although there were concerns about her ability to provide the children with a safe and stable home, "it is clear from the evidence presented at trial that [Mother] has made the requisite life changes that enable her to provide a safe and stable home for her children, thereby negating any present and future emotional and physical danger to her children." Although Mother leased a home, which was in considerably better condition than her initial home and did not appear to pose a danger to the children, she did not lease the property until February 2023, a year after the children were removed from her home, and she did not have beds with mattresses for the children before the last day of trial. *See In re S.R.*, 452

S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (stating "factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination"); *see also In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (holding father's "efforts to improve his ability to effectively parent on the eve of trial [were] not enough to overcome a decade of poor parenting and neglect" for purposes of best-interest analysis).

Mother suggests that her history of drug use does not weigh in favor of a finding that termination of her rights was in Mike's and Ivan's best interest because she enrolled herself in an outpatient program to address her marijuana use and "there is no evidence in the record that [she] used marijuana in her children's presence or while she was caring for them, or that she was ever impaired while caring for the children." We disagree. A parent's use of illegal drugs may constitute endangering conduct because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re J.O.A.*, 283 S.W.3d at 345 ("[A] parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct."). It is not necessary that the drug use occur in the presence of the child or that the parent actually be impaired. *See In re N.J.H.*, 575 S.W.3d 822, 831 (Tex. App.—Houston

86

[1st Dist.] 2018, pet. denied) ("Because it significantly harms the parenting relationship, drug activity can constitute endangerment even if it transpires outside the child's presence."). In addition, Mother did not enroll in an outpatient substance abuse program to address her marijuana use until after she tested positive for drugs during trial. *See In re S.R.*, 452 S.W.3d at 368 (stating "factfinder may conclude that a parent's changes shortly before trial are too late to have an impact on the best-interest determination").

With regard to Mike, the record reflects that Mike requested that Mother's parental rights to him be terminated. *See Holley*, 544 S.W.2d at 372 (identifying desires of child as best interest factor). Mike has been living with Father G since August 2022, and by all accounts, Father G is keeping Mike safe and meeting his needs. Mike is bonded with Father G and he asked the trial court to change his surname to Father G's surname. The record reflects that Mike is happy with Father G, he is doing well, and he has not lived with Mother for eighteen months. *See In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires."). The Department did not have any

concerns about Mike's placement with Father G or express any concerns about Father G's parenting abilities.

Ivan, who is four years old, has been diagnosed with autism, developmental delays, and encephalopathy, and he is receiving speech and occupational therapy to address his needs. *See* TEX. FAM. CODE § 263.307(b)(1) (identifying child's age and physical and mental vulnerabilities as best interest factor); *In re D.D.M.*, No. 01-18-01033-CV, 2019 WL 2939259, at *5 (Tex. App.—Houston [1st Dist.] July 9, 2019, no pet.) (mem. op.) ("Evidence of this factor generally demonstrates what the children's physical needs are, specifically any special physical needs, and whether the parent seeking custody [is] willing and able to meet those needs."). He is in a special needs foster home with licensed caregivers, and although it is not an adoptive placement, the foster home is meeting all of Ivan's extensive needs. *See In re E.C.R.*, 402 S.W.3d at 250 (stating courts "examine the entire record to decide best interest" and "lack of evidence about [specific] definitive plans for [the] permanent placement and adoption" of children not dispositive in best-interest analysis) (internal quotations omitted)); *In re T.C.*, No. 01-17-00497-CV, 2018 WL 4126600, at *26 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. denied) (mem. op.) ("[T]he fact that [the child] is not currently in a long-term or permanent placement is not a dispositive fact.").

Ivan, who was mostly non-verbal when he came into care, is beginning to use some verbal expressions, attending Pre-K, and his socialization skills have improved since moving to his current placement. According to Piaskowski, there are other children in Ivan's current foster home that "he connects with, and . . . [Ivan] seemed to be very happy and doing very well." Although he wore a diaper when he came into the Department's care, Ivan's potty-training is progressing well in his current placement.

When a child is too young or unable to express his desires, like Ivan, the fact finder may consider that "the child has bonded with the foster family, is well-cared for by them, and has spent minimal time with the parent." *See In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Although there is no evidence that Ivan is bonded with his current foster family, he is happy in his current placement, which is meeting all of his needs, and Ivan had not lived with Mother for over a year and half when trial ended.

Ivan's young age also weighs in favor of the trial court's finding that termination of Mother's parental rights is in his best interest. *See In re A.L.B.*, No. 01-17-00547-CV, 2017 WL 6519969 *5 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (mem. op.) (stating children's young ages—five and six years old—rendered them vulnerable if left with parent unable or unwilling to protect them or attend to their needs).

Viewing the evidence in the light most favorable to the trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in Mike's and Ivan's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in Mike's and Ivan's best interest. *Id.*; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

We overrule Mother's sole issue.

## Conclusion

We affirm the trial court's decree of termination.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.